Shelia WINSETT, Appellant,

v.

Togo D. WEST, Jr., Secretary of Veterans Affairs, Appellee.

No. 95–1109.

United States Court of Veterans Appeals.

Argued Aug. 6, 1998.

Decided Sept. 21, 1998.

Linda Blauhut, with whom William S. Mailander and Michael P. Horan, Washington, DC, were on the briefs, for appellant.

Gary E. O'Connor, with whom Mary Lou Keener, General Counsel; Ron Garvin, Assistant General Counsel; Adrienne Koerber, Deputy Assistant General Counsel; and Amy S. Gordon, Washington, DC, were on the brief, for appellee.

Before NEBEKER, Chief Judge, and FARLEY and GREENE, Judges.

NEBEKER, Chief Judge, filed the opinion of the Court.

FARLEY, Judge, filed a concurring opinion.

NEBEKER, Chief Judge:

The appellant, Shelia Winsett, appeals an October 31, 1995, decision of the Board of Veterans' Appeals (BVA or Board) which denied entitlement to dependency and indemnity compensation (DIC) for the veteran's children upon a finding that the death of the veteran, Gary W. Jacks, was not service connected. Upon consideration of the briefs of the parties, oral argument, and the record on appeal, the Court will affirm the Board's decision.

## I. FACTS

The veteran served in the U.S. Army from May 1969 to January 1972. Record (R.) at 57. His military service included a tour of duty in Vietnam. *Id.* In May 1983, the veteran sought service connection for a back condition and a foot condition. R. at 59–62. Shortly thereafter, his claim was denied by a

VA regional office (RO) decision. R. at 68–69. In October 1983, he amended his claim to add post-traumatic stress disorder (PTSD). R. at 77. In February 1984, the RO again denied his claims for service connection for back and foot disorders, but did not address the claim for PTSD. R. at 98–100. In 1989, the veteran was awarded disability payments under the Agent Orange Veteran Payment Program. R. at 432. (The Agent Orange Payment Program was established by court settlement of a class-action, product-liability suit brought by Vietnam veterans against manufacturers of Agent Orange. *See, e.g., In re Agent Orange Product Liability Litigation*, 597 F.Supp. 740 (E.D.N.Y.1984), *aff'd*, 818 F.2d 145 (2d Cir. 1987) (setting the parameters for a multi-million-dollar veteran-compensation program, the Agent Orange Veteran Payment Program, funded by manufacturers of Agent Orange).)

On June 22, 1989, Gary Jacks died. R. at 202. The veteran's treating physician, Dr. George Weaver, completed the death certificate, which listed respiratory arrest, grand mal seizures, and myocardial infarction, as the immediate causes of death. *Id.* Also in the death certificate, Dr. Weaver listed "Agent Orange exposure" as "Other significant conditions . . . contributing to death but not related to [immediate] cause." *Id.* In July 1989, the appellant, Shelia Winsett, filed an application for Dependency and Indemnity Compensation (DIC) on behalf of the veteran's minor children. R. at 197–200. Noting that the veteran did not have any service-connected disabilities and that the cause of death was not due to his military service, the RO denied the claim. R. at 204–05. In July 1990, Dr. Weaver wrote the following:

> Gary Wayne Jacks was under my care and treatment until his death on June 22, 1989. This is to certify that prior to his entry to the Armed Service his physical and mental status was normal. Mr. Jacks gave a history of exposure to Agent Orange and in my opinion his health progressively deteriorated after this exposure.

R. at 622. Ms. Winsett continued to submit evidence to support service connection for the cause of the veteran's death on behalf of her children (*see* R. at 369–81, 406–07, 424–25); however, the RO continued to deny the claim (R. at 402, 468). She appealed to the BVA in September 1992. R. at 541–47. In July 1993, Dr. Weaver stated that the veteran "died a cardiac death and had arteriosclerotic heart disease." R. at 685. Dr. Weaver further admitted, "I don't know all [e]ffects Ag[ent] Orange had on this man but this patient had a significant shortening of life. It is possible that Agent Orange contributed to his demise and to his seizure." *Id.*

In July 1995, the Board informed Ms. Winsett that it was seeking an opinion "from a medical expert associated with the Department of Veterans Affairs." R. at 722. The Board's request of the Spokane, Washington, VA Medical Center was "pursuant to 38 U.S.C. § 7109(1994) and as set forth in [Veterans Health Administration] Directive 10–95–040[.]" R. at 724. A July 31, 1995, letter signed by Thomas L. Ayres, a VA Medical Center Director, stated the following:

> In response to your request for a medical expert opinion, the appellant's case was reviewed by our Environmental Physician, Nancy McPhail, M.D.
>
> On review of the documents provided to Dr. McPhail, she could find no objective evidence to substantiate a claim that the defendant's death was caused by or aggravated by exposure to Agent Orange. The letters written on behalf of the claim suggest that the cause of death was secondary to seizure disorder and myocardial infarction which are possibly tied to Agent Orange and peripheral neuropathy. This is not a reasonable association in her opinion.
>
> . . . .
>
> In conclusion, Dr. McPhail could find no evidence in the records provided to suggest the veteran's death from a seizure disorder and myocardial infarction could be related to exposure to Agent Orange.

R. at 734. On August 22, 1995, the Board requested that Dr. McPhail sign the letter, and return it to the BVA (R. at 736), and a handwritten notation in the record reflects that this was completed in early September 1995 (R. at 738). On September 26, 1995, a supplemental statement was submitted by

the American Legion on behalf of Ms. Winsett "[i]n response to the recently obtained [VA] medical opinion" (R. at 740–44), along with additional documents and comment (R. at 747–74). According to a September 28, 1995, letter from Dr. Kelley A. Brix, Study Director at the Institute of Health, Ms. Winsett had requested information from the Institute of Health regarding "health effects which may result from exposure to a toxic substance." R. at 776. Dr. Brix noted that "[w]hile it is possible for a toxic exposure to cause the health effects you have listed in your letter, it is just as likely that they could have another cause." *Id.*

In the October 1995 BVA decision here on appeal, the Board denied service connection for the cause of the veteran's death. R. at 11–33. The Board concluded that the veteran's "cardiovascular disease was neither incurred in or aggravated by service, nor may it be presumed to have been incurred in service." R. at 16. The Board addressed the opinions of Dr. Weaver and Dr. McPhail, and explained that "[i]n light of Dr. McPhail's medical specialty and the marginal evidentiary value of Dr. Weaver's opinions, the Board finds much more probative Dr. McPhail's medical opinion." R. at 25. The Board stated the following:

> [In the July 1990 letter,] Dr. Weaver opined that the veteran's health deteriorated after exposure to Agent Orange in Vietnam. However, this medical opinion is not sufficient to establish service connection for the cause of the veteran's death because Dr. Weaver does not indicate what role the Agent Orange exposure played in the cause of the veteran's death from atherosclerotic heart disease.
>
> The same is true of Dr. Weaver's July 1993 statement. . . . Dr. Weaver admitted that he did not know all of the effects that Agent Orange exposure had on the veteran, but that the veteran "had a significant shortening of life," and that it was "possible that Agent Orange [exposure] contributed to his demise and to his seizure." The evidentiary value of Dr. Weaver's July 1993 opinion is severely weakened by his failure to directly attribute any disease the veteran had to Agent Orange exposure, and by his own confession that he is not

aware of what effects Agent Orange exposure had on the veteran.

R. at 24. The Board did not refer to the letter from Dr. Brix. Finally, the Board also noted that the fact that the veteran had received payments under the Agent Orange Payment Program did "not offset[ ] the expert medical opinion." R. at 27.

Before this Court, the appellant argues that the Board's reliance on Dr. McPhail's opinion was error because Dr. McPhail is an employee of VA. Therefore, her opinion is impermissible under 38 U.S.C. § 7109(a), the statute under which the Board purported to act in requesting the opinion. Appellant's Brief (Br.) at 12–16. Moreover, Ms. Winsett argues that the Veteran's Health Administration (VHA) directive, which permits VA-generated medical opinions under section 7109, is in violation of the statute, and that the opinion of Dr. McPhail should be removed from the record. *Id.*

The appellant also argues that the Board's statement of reasons or bases for its credibility and evidentiary determinations was in error. Finally, she argues that the Board erred in failing to address a pending claim for PTSD. Br. at 20, 24.

The Secretary argues that the Board properly examined and weighed the relevant evidence, and concluded that service connection for the cause of the veteran's death was not warranted. Secretary's Br. at 8–19. Accordingly, the Secretary asserts that there is a plausible basis in the record for the Board's determination, and that the denial of service connection must therefore be affirmed. *Id.* As to the appellant's contentions regarding section 7109, the Secretary argues, inter alia, that under the plain meaning of the statute, VA is not restricted to *independent* expert opinions, but rather, may request opinions from within the Department. Br. at 19–23.

## II. ANALYSIS

### A. Service Connection for the Cause of the Veteran's Death

Whether the veteran's death was related to his exposure to Agent Orange while in service is a question of fact which

this Court reviews under the "clearly erroneous" standard. *See Gilbert v. Derwinski,* 1 Vet.App. 49, 53 (1990). Under this standard, the Court may not substitute its own judgment for the factual determinations of the BVA, even if it would not have reached the same determinations. *Id.* In addition, 38 U.S.C. § 7104(d)(1) requires the BVA to provide adequate reasons or bases for its findings and conclusions on all material issues of fact or law. *See id.* at 56–57. The decision may not be based on the Board's own unsubstantiated medical conclusions but rather, must be supported on the basis of independent medical evidence in the record. *See Thurber v. Brown,* 5 Vet.App. 119, 123 (1993); *Colvin v. Derwinski,* 1 Vet.App. 171, 174 (1991).

In order to establish service connection for the cause of a veteran's death, the evidence must show that a disability incurred in or aggravated by service was either the principal or a contributory cause of death. 38 C.F.R. § 3.312(a). A service-connected disability will be considered to be the principal cause of death when it, either "singly or jointly with some other condition, was the immediate or underlying cause of death or was etiologically related thereto." 38 C.F.R. § 3.312(b). In defining what constitutes a "contributory cause of death," VA regulations provide:

> Contributory cause of death is inherently one not related to the principal cause. In determining whether the service-connected disability contributed to death, it must be shown that it contributed substantially or materially; that it combined to cause death; that it aided or lent assistance to the production of death. It is not sufficient to show that it casually shared in producing death, but rather it must be shown that there was a causal connection.

38 C.F.R. § 3.312(c)(1); *see also Ashley v. Brown,* 6 Vet.App. 52, 57–58 (1993).

 In the present case, along with the veteran's death certificate and medical records, the relevant medical evidence includes two statements by Dr. Weaver, the statement of Dr. McPhail, and the statement of Dr. Brix. R. at 622, 685, 738, 776. Regarding the statements by Dr. Weaver, the Board noted the inconclusive language and the lack of an opinion expressly linking Agent Orange to the immediate cause of the veteran's death. Further, the Board compared Dr. Weaver's statement to the letter signed by Dr. McPhail and concluded that, "[i]n light of Dr. McPhail's medical specialty and the marginal evidentiary value of Dr. Weaver's opinions, the Board finds much more probative Dr. McPhail's medical opinion." R. at 25. It is axiomatic that while the Board is not required to accept the proffered medical opinion supporting a claim, it must "provide its reasons for rejecting such evidence and, more importantly, must provide a medical basis other than its own unsubstantiated conclusions to support its ultimate decision." *Ashley,* 6 Vet.App. at 58; *Colvin,* 1 Vet.App. at 175. A review of the statement by Dr. Brix discloses that no opinion regarding the veteran's death and its alleged relation to Agent Orange was expressed. *See* R. at 776. While acknowledging that a relationship between the conditions listed by Ms. Winsett in her letter might exist, Dr. Brix further admitted that "it is just as likely that they could have another cause." *Id.* In *Tirpak v. Derwinski,* the Court suggested that "may or may not" terminology is an insufficient basis for an award of service connection. 2 Vet. App. 609 (1992). Accordingly, and based on a review of all medical evidence of record, the Court holds that the Board's decision contains a plausible basis, and must therefore be affirmed. *Gilbert, supra.*

 The Court further holds that the Board's decision is supported by an adequate statement of reasons or bases which sufficiently explains why, in the view of the Board, Dr. McPhail's opinion outweighed Dr. Weaver's. "It is not error for the BVA to favor the opinion of one competent medical expert over that of another when the Board gives an adequate statement of reasons and bases. It is the responsibility of the BVA, not this Court, to assess the credibility and weight to be given to evidence." *Owens v. Brown,* 7 Vet.App. 429, 433 (1995). Moreover, the Court has expressly declined to adopt a "treating physician rule" which would afford greater weight to the opinion of a veteran's treating physician over the opinion

of a VA or other physician. *Guerrieri v. Brown*, 4 Vet.App. 467, 471–73 (1993). Therefore, and despite the appellant's urging, the Court holds that the failure of the Board to ascribe additional evidentiary value to Dr. Weaver's opinion by virtue of his being the veteran's treating physician was not error. *Id.*

■ Finally, the fact that Dr. Weaver listed "Agent Orange exposure" as one "[o]ther significant condition[ ] ... contributing to death but not related to [immediate] cause" of death on the veteran's death certificate need not have been dispositive of the claim before the Board. Exposure to Agent Orange, without more, is not a compensable occurrence. *See* 38 U.S.C. § 1116; *see also* 38 C.F.R. § 3.309(e); *Combee v. Brown*, 34 F.3d 1039, 1045 (Fed.Cir.1994). On the death certificate, Dr. Weaver failed to list a disease or condition *caused* by Agent Orange exposure which "contributed substantially or materially" to death, or that "combined to cause death," or "aided or lent assistance to the production of death." 38 C.F.R. § 3.312(c)(1).

### B. Agent Orange Payment Program

■ The appellant argues that the Board failed to develop fully the record "with respect to the veteran's participation in a settlement agreement that benefited victims of Agent Orange exposure." Appellant's Br. at 11. A similar argument was made before this Court in *Brock v. Brown*, 10 Vet.App. 155 (1997). In that case, "the appellant contend[ed] that the BVA failed to take account of ... his enrollment in the Agent Orange Veteran Payment Program." *Id.* at 161. Respecting the veteran's involvement in the Agent Orange Payment Program, the Court stated:

> Neither does the undated notice of acceptance in the Agent Orange Veteran Payment Program nor the letter from that Program concerning payments address the medical conditions at issue before the BVA. Moreover, although enrollment in that Program might seem to be probative of the veteran's possession of an Agent–Orange–related disability, the Court is aware of no information suggesting that receipt of payments under that Program—established by court settlement of a class-action, product-liability suit brought by Vietnam veterans against manufacturers of Agent Orange—turns on any finding that a veteran has an Agent–Orange–related ailment. In fact, the U.S. District Court for the Eastern District of New York described the Program as follows:
>
> > Vietnam veterans exposed to Agent Orange who suffered total (100%) disabilities arising from non-traumatic, non-accidental and non-self-inflicted causes [are] eligible for payments [citation omitted]. The definition of total disability was taken from the Social Security Act, and Social Security Administration determinations of disability would be taken as evidence of disability for the Agent Orange Payment Program.
>
> *In re Agent Orange Product Liability Litigation*, 689 F.Supp. 1250, 1257–58 (E.D.N.Y.1988). The standards required for receipt of compensation under the Agent Orange Veteran Payment Program thus appear very different from those required to establish a service-connected disability under chapter 11 of title 38, U.S.Code. Even if the Court were to conclude that these Program documents are prima facie evidence that the veteran is receiving payments under that Program, there is no indication that the receipt of benefits thereunder is premised upon a present disability with connection to exposure to Agent Orange or to military service; the Program eligibility requirements quite clearly appear to be simply service, exposure to Agent Orange, and total disability.

*Brock*, 10 Vet.App. at 161–62 (citations omitted). In the present case, and as did the Court in *Brock*, we hold that the Board's failure to "fully develop" the record as it pertained to the veteran's participation in the Agent Orange Payment Program is not error.

### C. 38 U.S.C. § 7109

■ The appellant asserted that the BVA's reference to section 7109 of title 38 of the United States Code conferred on her a

right and a corresponding duty on the Secretary to get a medical opinion from someone not employed by VA. She also contended in her brief and at oral argument that a violation of that right tainted the VA medical opinion so that it should be excluded from consideration. We need not decide that question because we hold that neither section 7109 nor reference to it in the Board's request for a medical opinion confers a right to an independent medical opinion from an expert not employed by VA. In *Austin v. Brown*, the Court expressly declined to address whether "38 U.S.C. § 7109 precludes the BVA from obtaining any medical opinions not rendered by an independent source." 6 Vet.App. 547, 550 (1994). Today, we hold that it does not.

Section 7109 of title 38 of the United States Code states:

(a) When, in the judgment of the Board, expert medical opinion, in addition to that available within [VA], is warranted by the medical complexity or controversy involved in an appeal case, the Board may secure an advisory medical opinion from one or more independent medical experts who are not employees of the Department.

(b) The Secretary shall make necessary arrangements with recognized medical schools, universities, or clinics to furnish such advisory medical opinions at the request of the Chairman of the Board. Any such arrangement shall provide that the actual selection of the expert or experts to give the advisory opinion in an individual case shall be made by an appropriate official of such institution.

(c) The Board shall furnish a claimant with notice that an advisory medical opinion has been requested under this section with respect to a claimant's case and shall furnish the claimant with a copy of such opinion when it is received by the Board.

*See also* 38 U.S.C. § 5109 (similar statutory provision authorizing the Secretary, rather than the Board, to obtain an independent medical opinion). Thus, by express language, whether the Board chooses to refer a particular case for an independent medical opinion is entirely within its discretion. It is uncontested that the Board has the authority, and in many cases the duty, to obtain an expert medical opinion irrespective of section 7109. *See Ashley* and *Colvin,* both *supra; see also Perry v. Brown,* 9 Vet.App. 2, 6 (1996) ("The Board may seek to obtain [a medical opinion] itself through a VA Veterans Health Administration or non-VA IME opinion, or through a remand to the RO for it to obtain an IME opinion, or to provide for a VA examination of the veteran." (citations omitted)).

A reading of section 7109 leaves no room for concluding that mentioning that section in a request for a VA medical opinion somehow gave rise to a right to an outside expert's opinion. The provision is simply an enabling provision allowing the Board, in instances of medical complexity or controversy, the purely discretionary authority to seek an outside opinion. *See* 38 U.S.C. § 7109(a). Subsection (b) requires the Secretary to arrange with non-VA entities for such opinions when the Board asks for one and leaves those entities free to choose the experts. That subsection (c) of section 7109 requires notice and provision of a copy of the opinion to a claimant (as does section 5109), merely restates the procedural process due a claimant under higher law before a decision is made. Thus, the appellant's construction of the provision and reference to it by the Board presses our interpretation authority beyond that which is appropriate. We are being invited to legislate beyond the obvious purpose of the enacting authorities; an invitation we must decline. *See Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983).

## III. CONCLUSION

The Court has reviewed the appellant's remaining arguments and is not convinced that they warrant the relief sought. Accordingly, the Board's October 31, 1995, decision is AFFIRMED. In so doing, the Court notes that at oral argument and in his brief, counsel for the Secretary conceded that a decision on the veteran's PTSD claim has never been rendered. Secretary's Br. at 27. In view of the arguments and concessions presented, that claim remains pending and has yet to be the subject of a final BVA

decision. Therefore, the Court does not consider the PTSD claim on the merits at this time. The Court trusts that, given the long history of this case, the Secretary will take the steps necessary to ensure that a final BVA decision on the pending PTSD claim be rendered posthaste.

FARLEY, Judge, concurring:

Assuming the arguments vehemently advanced by counsel for appellant must be reached and resolved, I concur wholeheartedly in the majority opinion and judgment. Left to my own devices, however, I would have viewed the reference to 38 U.S.C. § 7109 in the intra-agency letters as a de minimis drafting misstep, one having neither legal significance nor consequences. As is evident from the text of those letters, the Board's request was to VA medical personnel for "your" review and opinion (R. at 724, 731) and the proper administrative authority for such action, "VHA Directive 10–95–040 dated April 17, 1995," was specifically referenced. The appellant was never told that an independent medical opinion was being sought; rather, she was advised that the Board had "requested an opinion from a medical expert associated with the Department of Veterans Affairs." R. at 722. To my reading, the solicitation of an independent medical opinion from outside VA was never contemplated by anyone involved and the arguments of appellant's counsel in that regard bring to mind one of the Bard's plays: *Much Ado About Nothing.*